UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,

v.                                              1:24-cr-165

ABIODUN OGUNWALE, *ET AL.*,
                *Defendants.*

**MEMORANDUM OPINION AND ORDER**

Abiodun Ogunwale was the director of business development at Project HOPE, a global nonprofit that competed for grants and contracts to perform health-related services across the developing world. This meant he was responsible for managing the drafting of bids or proposals for grants and contracts and helping place the nonprofit in the best position to receive such funds. Ogunwale had at his disposal a team of business development professionals and on-the-ground staff across the world but also had the authority to engage outside contractors. After an investigation by the Inspector General for the United States Agency for International Development ("USAID") and the FBI, a grand jury indicted Ogunwale and his alleged co-conspirator, Abimbola Ajayi, on charges of conspiracy, fraud, and money laundering.

After months of complex pre-trial proceedings, Defendants were tried before a jury of this Court. The Government introduced evidence that showed how Ogunwale engaged Ajayi as a contractor for Project HOPE. He followed the ordinary process for onboarding her, but from there things took a turn. Instead of Ajayi performing work, then drafting an invoice and sending that invoice to the nonprofit alongside the deliverables, Ogunwale himself drafted Ajayi's invoices. He would then send them to her, instructing her to return them to Project HOPE's HR team with a copy to him, after which he would approve the invoices and payment would issue. All this occurred unbeknownst to Ogunwale's Project HOPE colleagues, several of whom testified that Ajayi did

not or could not have done the work described in the invoices. Indeed, most of the Project HOPE employees at trial testified that they had never even heard of Ajayi despite her claim to have worked on projects within those employees' portfolio. The jury also saw evidence that after receiving payment from Project HOPE, Ajayi would withdraw funds from her bank account and transfer them to accounts associated with Ogunwale. Ogunwale and Ajayi sought to cast doubt on this narrative, and called a single witness who testified that she would sometimes transfer money from Ogunwale to associates of Ajayi in Nigeria. They claimed that this showed that the post-invoice transfers between them were not kickbacks.

After a four day trial, the jury convicted both Defendants of conspiracy to commit wire and mail fraud and conspiracy to commit money laundering, and Ogunwale of mail fraud.

This matter now comes before the Court on Defendant Abimbola Ajayi's Motion to Compel Brady/Jencks disclosure (ECF 171), Defendant Ajayi's Rule 33 Motion for a New Trial, which Defendant Abiodun Ogunwale joins in relevant part (ECF 190), the Government's Motion for Leave to File a Surreply (ECF 201), and the Defendants' Motion for Leave to File a Supplement to their Motion for New Trial (ECF 203). The Court will GRANT the Government's Motion for Leave to File a Surreply to respond to new material the Defendants deployed in their reply brief. The Court will GRANT the Defendants' Motion for Leave to File a Supplement to their Motion for New Trial. Ajayi's motion to compel identifies no cause for this Court's intervention. Nor have Defendants cast doubt on the fundamental fairness of the trial proceedings. Accordingly, and for the ensuing reasons, the Court will therefore DENY both motions.

## I.    BACKGROUND

### A.    Pre-trial Proceedings

Ajayi and Ogunwale, both Nigerian-born naturalized United States citizens, were first indicted on September 26, 2024. ECF 1 ("2024 Indictment"). The five-count 2024 Indictment

charged both with conspiracy, conspiracy to commit money laundering, and two counts of wire fraud, and Ogunwale alone with mail fraud. *Id.* At Defendants' arraignment on October 11, 2024, both Defendants entered a plea of not guilty to all counts and the Court set a jury trial for March 17, 2025. ECF 11. Defendants were released on bond under standard conditions, including that they surrender their passports and remain in the Washington D.C. area. ECF 15; ECF 16.

On December 28, 2024, Ajayi filed a motion to travel to Nigeria for the sole purpose of attending her brother's wedding. ECF 26. Finding that an overseas trip to Nigeria just over six weeks before her scheduled trial posed a "grave risk of non-appearance at trial," the Court denied that motion. ECF 28.

The Defendants together filed several other motions in January, including a motion to sever their joint trial, a motion to suppress Ajayi's bank records, and a motion to suppress evidence seized from Ajayi's Google accounts. ECF 31; ECF 35; ECF 36. Ogunwale separately moved for issuance of a subpoena *duces tecum* to Project HOPE, his former employer and the alleged victim of Defendants' fraud and conspiracy. ECF 30. A day before the motions hearing, Ogunwale filed a motion for approval to travel to Nigeria, claiming that Nigerian banks had relevant records he could only collect in person, and that he needed to meet with individuals to collect evidence. ECF 61.

On February 5, 2025, the United States filed a superseding indictment (the "Superseding Indictment") which charged the same offenses but included slightly different factual allegations. ECF 62. The Court held a hearing on Defendants' motions alongside their re-arraignment the next day. The Court denied the motion to sever without prejudice to re-file a motion under the Superseding Indictment. Feb. Motions Tr. (ECF 172) at 11:14-12:10. The Court denied the motion to suppress Ajayi's financial records, which Ajayi's counsel acknowledged was an effort to

preserve the argument—foreclosed by Supreme Court and Fourth Circuit precedent—for appeal. *Id.* at 14:19-16:15. The Court also denied the motion to suppress Google account records, noting that the Fourth Circuit had upheld similar warrants. *Id.* at 29:1-24. As for Ogunwale's motion for a subpoena *duces tecum*, the Court applied the factors outlined in *United States v. Nixon*, 418 U.S. 683 (1974) to find that Ogunwale's proposed subpoenas were an overbroad "fishing expedition." Feb. Motions Tr. at 51:7-53-5. (noting that "it's not the Court's job to try to sift through a much larger amount [of requested documents] just to figure out whether there's a nugget of something that is appropriate and is relevant"). Recognizing that Ogunwale might be able to identify a more specific set of relevant documents, the Court denied the motion without prejudice to a future motion. *Id.* The Court then continued the trial date to May 12, 2025 due to the Superseding Indictment, and deferred ruling on Ogunwale's motion to travel pending his submission of additional information. ECF 65.

On February 25, 2025, Ogunwale filed his second motion for the issuance of subpoenas *duces tecum*, seeking eight broad categories of documents from Project HOPE. ECF 67. These included the copies of funding proposals developed by Ogunwale based on his business development efforts for Project HOPE in several countries. *Id.* Ogunwale also filed a second motion for travel, claiming he needed to collect records in Nigeria "which cannot be obtained unless [he] appears personally," and to "meet with various development partners and government agencies." ECF 68.

The Court held a hearing on those motions on March 27, 2025. The Court again denied the motion for a subpoena but held a lengthy discussion with counsel from both sides. It was agreed that the Government would provide a list of all the invoices it intended to introduce to prove fraud, so that Ogunwale could subpoena the specific Project HOPE proposals relating to those invoices,

4

his theory being that the contents of those proposals might show that the work described in the invoice was performed by the contractors with whom he worked. Mar. Motions Tr. (ECF 173) at 21:15-29:10. The Court then denied Ogunwale's motion to travel because he had not made a clear showing beyond the assertions in his motion "why the information that is identified from potential banks and sources overseas can't be obtained through the use of a power of attorney or direct communication through email and phone and other means," and that the "risk of flight" so close to trial was too great. *Id.* at 33:5-17.

After the parties conferred, the Court granted Ogunwale's third motion for a subpoena *duces tecum* and a subpoena issued to Project HOPE for thirty final proposals relating to the invoices the Government planned to introduce. ECF 83; ECF 85. In the weeks leading up to trial, Ogunwale moved for a show cause hearing, arguing Project HOPE had not fully complied with the subpoena *duces tecum*. ECF 114. According to Ogunwale's motion and its attachments, Project HOPE did not attach some of the requested proposals because no such final proposal existed in its records. ECF 114. Both Defendants also moved for a further continuance of the trial, citing the fact that Project HOPE had not produced all the documents they requested, Ogunwale's need to travel to Nigeria, and Defendants' intent to call as a witness Ms. Dayo Fasola, who "provided funds on Ogunwale's behalf to . . . Ajayi's family and to vendors owed by Ajayi in Nigeria." ECF 99.

The Court held another pretrial hearing on May 1. In deciding the motion to continue, the Court noted: "I'm sympathetic to the challenges the defendants have . . . but in this case, we already set this matter outside the speedy trial deadline based on a joint request from the parties, and the defendants have known about the issues in this case since the first indictment." May 1 Motions Tr. (ECF 174) at 25:4-10.  The Court found Defendant's late-in-the-game claim that they needed time

to arrange for a witness to travel from Nigeria was inappropriate, as Defendants could "have taken actions at an earlier time" to procure that witness. *Id.* at 16:23-17:8. As for the motion to show cause, the Court found on its examination of the record that "[t]here's nothing in those materials that suggest to me . . . bad faith on [Project HOPE's] part or that they're purposely hiding documents from you." *Id.* at 19:1-4. It therefore denied the motion, but "require[d] that counsel," including Project HOPE's counsel, "after this hearing, discuss amongst themselves what steps have been taken to make sure that the subpoena has been complied with." *Id.* at 51:1-3.

After the May 1 hearing, Ogunwale submitted a fourth motion for issuance of a subpoena *duces tecum*, renewing requests that the Court had already denied for "[f]ive examples of pre-positioning consultants' invoices that are not alleged to be fraudulent" and "[a]ll pre-positioning documents from 2014 to 2020 which are presently in Project Hope's possession." ECF 126. The parties "reached a stipulation that dispose[d] of" the latter request. May 8 Motions Tr. (ECF 175) at 14:24. As for the former, the Court denied the motion, noting that "the government is not intending to argue that because of the nature of the entries, they must be false; in other words, that as compared to a more detailed invoice, these ones are too vague." *Id.* at 17:20-23. The "desire to compare [the invoices at issue] to some other hypothetical invoice" was thus "irrelevant." *Id.* at 18:6-8.

Just days before trial was set to begin, Ogunwale announced—contradicting his prior representations—that he had been able to procure Ms. Fasola's attendance at the trial and planned to call her as a defense witness. ECF 129. He filed a notice of expert testimony, arguing that "the entirety of [Fasola's] proposed testimony qualifies as fact testimony" but that he was noticing her as an expert out of an abundance of caution regarding proposed testimony about "the widespread nature of the co-defendants [sic.] financial behavior in this case." *Id.* at 1-2. At a hearing on May

6

8, 2025, the Court and counsel for both sides discussed Ms. Fasola's planned testimony. As to fact testimony, the Court found that an attempt to elicit from Ms. Fasola facts about "what other people do in money transmitting . . . would rest entirely on hearsay," and that she could not, as a fact witness, "talk generally about what people know in Nigeria or whether or not this industry operates in a particular way." May 8 Mot. Tr. (ECF 175) at 7:6-16 ("That doesn't mean she couldn't say, I have a money-transmitting business; I've done it for 20 years; I have 100 customers; one of my customers is Mr. Ogunwale."). The Court also held that any attempt to elicit from Fasola "where Mr. Ogunwale got the money or what Mr. Ogunwale told her explicitly about why he was sending the money or to whom" was inadmissible hearsay. *Id.* at 7:18-22. The Court deferred consideration of whether Fasola could present "expert testimony to talk about how [the facts here] fit[] into a bigger international economic system or whether that is something that often happens with regard to Nigeria," allowing for the potential assessment of her qualifications during trial. *Id.* at 8:4-19, 9:4-8.

Just before the trial was set to take place, the United States moved to dismiss the two substantive counts of wire fraud (counts one and two) charged in the Superseding Indictment. Tr. Vol. 1 at 5:4-14. The Government subsequently filed a written motion, which the Court granted. ECF 153; 154.

## B. Trial

### 1. The Government's Case

The Government called nine witnesses, including six current or former Project HOPE employees, a venue witness from the United States Postal Service ("USPS"), a witness from PayPal, and the Government's case agent, Clint Hemberg.

*Mandy Luety*. Mandy Luety was the head of HR at Project HOPE. Tr. Vol. 1 (ECF 179) at 137-138. She explained some of Project HOPE's policies regarding conflicts of interest and

accurate recordkeeping. *Id.* at 141-147. She also explained the process of onboarding external consultants for Project HOPE, which required approval of a department head like Ogunwale. *Id.* at 154-156. She reviewed Ajayi's onboarding documents, which showed Ogunwale was the hiring manager. *Id.* at 157-159. She also reviewed exhibits showing the onboarding of another consultant, Damilola Adeoye, for whom Ogunwale was also the hiring manager. *Id.* at 163-164.

Luety then explained how contractors were paid. After performing work, a contractor would "submit [an invoice] either to HR directly or a combination of HR and the hiring manager or sometimes they'll send it directly only to the hiring manager." Tr. Vol. 1 at 166:4-6. The hiring manager would then, after "confirming that work was completed," approve the invoice so that it could be paid. *Id.* at 166:11-12. Luety clarified that she did not review the contents of invoices for their accuracy but instead relied on hiring managers like Ogunwale. *Id.* at 174. She explained that Ajayi would send invoices as a contractor to Luety herself and Ogunwale by email, after which Ogunwale would usually quickly send a terse email approving those invoices. *Id.* at 174-177. The same was true of invoices from Adeoye. *Id.* at 183.

*Giuliana Castro*. The Government's next witness, Giuliana Castro, worked as the "senior manager of accounts payable" at Project HOPE, managing payment of invoices and reconciliations for the nonprofit. Tr. Vol. 1 at 214-215. She reviewed proof that payment had been issued for the approved invoices from Ajayi and Adeoye. *Id.* at 217-227. She also reviewed expense reports from Ogunwale requesting reimbursement for payments to a company variously called Compass Management, CMGTSS, or CMGT, and a company variously called AFAB or AbbiFabDynamics, and expenses paid to an individual named Damilola Adeoye. *Id.* at 237-49.

*Rebecca Peabody*. The Government's third witness was Rebecca Peabody, a law-enforcement liaison at PayPal. Tr. Vol. 2A (ECF 180) at 12-13. Her testimony established that the

PayPal account for Compass Management was registered using the name of Ogunwale's wife as well as an email with Ogunwale's name in it, and that invoices from the account were paid from an account associated with an individual named Anthony Tredon. *Id.* at 26-29. She also reviewed evidence that the email address associated with the Tredon PayPal account was the same personal email apparently belonging to Ogunwale. *Id.* at 31.

*Anthony Tredon.* The next witness was Anthony Tredon, a former Project HOPE employee (from 2010 to 2020) who worked as a business development specialist. Tr. Vol. 2A at 48-49. Tredon reported to Ogunwale from 2014 through 2020. *Id.* at 50:15-17. He explained how the business development team at Project Hope would work—sometimes with the Africa team—on proposals for funding opportunities from USAID. *Id.* at 53:9-16. The internal team would often draft technical narratives for the proposals, though they sometimes brought in subject matter experts. *Id.* at 53:17-54:11. He also explained the "checklists" that Project HOPE would keep as part of the proposal drafting process to ensure that each sub-task would have a person assigned to completing it. *Id.* at 54:16-55:7. Individuals who worked on technical narratives or the proposals were generally listed on the checklists, which Tredon created as part of his job. *Id.* at 55:11-21. Ogunwale would usually review those checklists. *Id.* at 55:22-24. Tredon testified that he was familiar with Ajayi's name as a consultant Ogunwale sometimes used, but that he only interacted with her at Ogunwale's direction. Tr. Vol. 2A at 59-61. He also recognized Adeoye's name from his time at Project HOPE. *Id.* Tredon also told the jury that he had a company credit card with Project HOPE and had shared the card information at Ogunwale's request. Tr. Vol. 2A at 63-64.

*Steve Neri.* The next witness was another Project HOPE employee, Steve Neri. Neri is a global health professional with broad experience, including working for USAID directly. Tr. Vol. 2A at 130-132. Neri began at Project HOPE as the country director for programs in Namibia, then

9

became the organization's regional director overseeing operations across Africa. *Id.* at 133-134. He described Project HOPE's Africa operations, which included health care delivery, medicine delivery, and health worker trainings across many African countries. *Id.* at 135-136. Neri also worked to coordinate business development for Africa. *Id.* at 136:23-137:25. Neri testified that as the director for Africa, he would have a great deal of knowledge about on-the-ground business development operations there. *Id.* at 137-138.

Neri testified that he would have contact with business development consultants working in Africa because of his role overseeing those operations. Tr. Vol. 2B (ECF 176) at 18:17-25. Neri told the jury that he was not familiar with either Ajayi or Adeoye. *Id.* 19:1-3.

Neri then walked through a number of specific invoices that Ajayi had submitted to Project HOPE, testifying that the tasks described therein were not typically performed by outside contractors, and that he had no knowledge of Ajayi working on any of the projects. Tr. Vol. 2B at 27-60. For instance, Ajayi submitted an invoice requesting payment for meeting with the Nigerian embassy "to pitch for funding," which is something Neri and a Project HOPE country representative would need to know about and participate in, and would at least have been "part of [a] weekly meeting." *Id.* at 31:24-32:14. But Neri was never told that Ajayi met with the embassy. *Id.* at 32:15-17. For another project for which Ajayi invoiced Project HOPE for drafting work, Neri ran down the list of individuals he remembered being involved, including a subject-matter expert in TB in Nigeria who was brought in as an outside consultant, and testified that he would have met Ajayi and/or she would have been listed on Project HOPE's checklist if she had done the work described in her invoice. *Id.* at 41-42. This pattern was repeated across many invoices.

Defendants' cross-examination of Neri focused on eliciting some of the complexities in business development work and explored the nature of pre-positioning work that was not geared

towards a specific proposal. Tr. Vol. 2B at 66-116. The only defense exhibits that were introduced through Neri were two photos of Neri and Ogunwale in front of the Nigerian CDC. *Id.* at 83-85.

*David Science.* David Science, a Project HOPE IT employee, testified that when Ogunwale returned his laptop to Project HOPE after his termination, it appeared to have been reset to its factory settings. Tr. Vol. 2B at 117-123.

*Laura Brye.* Laura Brye, another Project HOPE employee, worked as a consultant before becoming an employee at Project HOPE's Virginia office working in the business development department under Ogunwale. Tr. Vol. 2B at 128-129. Brye was typically the lead writer for the nonprofit's USAID proposals. *Id.* at 130:12-15. Brye, who sometimes worked with subject-matter expert consultants on proposals, did not recall ever working with Ajayi, Adeoye, or Compass Management. *Id.* at 131-132. Brye testified as to her work on several proposals for which she was the lead writer, telling the jury that Ajayi did not complete the tasks that she had invoiced Project HOPE for. *Id.* at 133-143. She testified, for instance, that she worked with all the individuals who "would author the technical narrative sections" of a proposal, and did not work with Ajayi even where Ajayi had claimed to have worked on those sections. *Id.* at 142:24-143:3. Brye further testified that when she had been an outside consultant to Project HOPE, she wrote her own invoices and tracked her own hours/deliverables. *Id.* at 143:9-18. Ogunwale's counsel introduced one of the proposals at issue on cross-examination, and Brye testified that she "wrote every part of the proposal" apart from several annexes. Tr. Vol. 2B at 148-149. Brye also testified on cross that most past proposals, including a few at issue in the case, would be stored on Project HOPE's internal cloud storage. *Id.* at 154-156. She explained that she was asked to help look for proposals in the weeks leading up to trial in response to Ogunwale's Rule 17 subpoena and found certain proposals except for some where Project HOPE was a sub-contractor. *Id.* at 159-162.

*Sean James*. Sean James, a USPS employee, was called as a venue witness to testify that a letter sent from Project HOPE's offices would have been processed through a facility in this District. Tr. Vol. 3 (ECF 177) at 15-19.

*Wondwossen Asefa*. The Government's next witness, Wondwossen Asefa, was at relevant times Project HOPE's deputy regional director for Africa. Tr. Vol. 3 at 25-27. His responsibilities in that role included working on business development. *Id.* at 27:7-14. Asefa, who is Ethiopian, explained his extensive work on a USAID Ethiopia proposal, and others, where Ajayi or Adeoye submitted invoices, but he had not worked with them at all. *Id.* at 32-40. On cross, Asefa looked at the Ethiopia proposal, which included letters of commitment from Ethiopian organizations to work on the project. *Id.* at 53-54. He explained the complex and multifaceted process of on-the-ground work that was required to secure these letters. *Id.* at 54-61.

*Clint Hemberg*. The last Government witness was FBI Agent Clint Hemberg. Tr. Vol. 3 at 80-81. Hemberg began by detailing Virginia corporation records linking Ogunwale to Compass Management. *Id.* at 86-87, 98-99. Tax records from Virginia and D.C. showed that Compass did not have any employees. *Id.* at 102. The Government also introduced records showing that AbbiFabDynamics, LLC was a Georgia corporation registered to Ajayi. *Id.* at 103-105.

Hemberg next walked the jury through a series of emails between Ogunwale's personal email account and Ajayi's personal email account. Hemberg concluded from reviewing the emails that every single invoice Ajayi submitted to Project HOPE "originated and was sent to her from [Ogunwale's] gmail account." Tr. Vol. 3 at 121:5-12. Hemberg showed in multiple instances that Ogunwale would send an email from his personal account to Ajayi with an invoice attached, directing her to send it back to Project HOPE. Ajayi would send the invoice to Project HOPE's HR and copy Ogunwale's business email address, at which time Ogunwale would approve the

invoice for payment. *Id.* at 129-157. Ogunwale would sometimes provide Ajayi instructions along with the invoices, for instance telling her to "[s]end around 9 a.m. US time. Copy my work email please." *Id.* at 145:18-19; *see also id.* at 131:16 ("To be sent to me."); *id.* at 135:119-20 (same). Ajayi submitted that particular invoice at 9:03 the next morning. *Id.* at 146:6-7.

One invoice Hemberg discussed stated that Ajayi traveled to an embassy in Borno, Nigeria for a funding pitch. Hemberg discussed Ajayi's bank records covering the period of time described in that same invoice. Tr. Vol. 3 at 138-139. Those records showed a consistent pattern of purchases in the Atlanta, Georgia, area including ATM withdrawals, Starbucks orders, and shopping at Nordstrom. *Id.* at 139-141.

Another time, Ajayi submitted an invoice and attached a "Compliance Matrix" as the deliverable. But the emails Hemberg discussed showed that Ogunwale was the origin of the "Compliance Matrix" and he emailed it to Ajayi along with the invoice she later submitted. Tr. Vol. 3 at 142-143. Project HOPE's internal checklist for the project showed that other individuals were responsible for the matrix. *Id.* at 144-145.

After a recess, Hemberg returned to the stand and described his attempt to interview Ajayi as part of his investigation. He testified that in May of 2023, he and another agent knocked on her door, identified themselves, and after saying "Oh, God" Ajayi "indicated she had to go to work" and could "reconnect later." Tr. Vol. 3 at 166-167.[1]

Hemberg then discussed a similar pattern of emails involving Ogunwale and Damilola Adeoye. Ogunwale sent invoices to Damilola Adeoye by email with instructions like "[p]lease send out by tomorrow," Adeoye would do so, and Ogunwale would approve the invoice. Tr. Vol. 3 at 168-170. The Government also introduced other emails between Adeoye and Ogunwale,

---

[1] On cross-examination, Hemberg testified that the interaction took place at about 7:00 a.m. in the morning, Tr. Vol. 3 at 230:9-10.

including one in which Adeoye told him "my rent is due month end" and asked: "is there any help you can render?" *Id.* at 181:12-15.

As for Compass Management, Hemberg explained that the bank records in evidence showed that funds paid to Compass' PayPal account with Project HOPE's credit card were then transferred into a bank account controlled by Ogunwale and his wife. Tr. Vol. 3 at 188-191.

Finally, Hemberg examined a pattern of financial transactions between Ajayi and Ogunwale. After Project HOPE paid Ajayi via direct deposit, Ajayi would withdraw funds from her bank account, and a similar amount would then be deposited into bank accounts controlled by Ogunwale. Tr. Vol. 3 at 201-211. For example, on November 25, 2016, Project HOPE paid Ajayi $16,800. The next month, Ajayi withdrew $10,000 in cash from her bank account and on the same day $10,000 was deposited into the Compass Management bank account. *Id.* at 202:12-19. On cross, Ajayi's counsel elicited testimony showing that in addition to these invoice-related payments, there were a range of payments back and forth between Ogunwale and Ajayi, including many in which Ogunwale paid Ajayi. Tr. Vol. 3 at 221-224.

### 2. The Defense Case

Defendants called just one witness, Dayo Fasola.[2] Neither Defendant attempted at trial to qualify Fasola as an expert witness in Nigerian commerce or any other matter. *See* May 8 Mot. Tr. at 8:4-19, 9:4-8. After testifying regarding her background, Fasola described how she would help transfer money from abroad "within the family or community" to avoid the costs associated with international wire transfers. Tr. Vol. 4A (ECF 181) at 32:18-33:8. She described other business dealings with Ogunwale, including that she had purchased land from him. *Id.* at 34:10-38:4. Fasola testified that in order to repay him for the land, she would sometimes send money to other people

---

[2] Both defendants elected not to testify. Tr. Vol. 4A at 63:17-64:17.

14

in Nigeria on his behalf. *Id.* at 39:2-08. Among these were "quite a few" payments to Ajayi. *Id.* at 40:12-17. These payments, by her estimates, amounted to about 30 million naira, an amount she estimated to be $120,000. *Id.* at 41:11-42:14. Fasola further testified that she made a single payment to Adeoye. *Id.* at 47:5-12. Fasola concluded by testifying that she quite frequently engaged in similar transactions for Nigerians and individuals abroad. *Id.* at 49:1-16.

During the testimony, the Court rejected attempts by Ogunwale's counsel to elicit from Fasola "why [Ogunwale] was asking [her] to" transfer funds to Ajayi or other people, finding that such testimony would amount to hearsay. Tr. Vol. 4A at 39:9-20, 46:25-47:3.

### 3.  Verdict

After jury instructions and closing arguments, the jury returned a verdict of guilty on all counts, convicting both Ogunwale and Ajayi of conspiracy to commit money laundering and conspiracy to commit wire and mail fraud, and Ogunwale guilty of mail fraud. ECF 159.

### C.    Post-Trial Proceedings

On June 26, 2025, Defendant Ajayi filed a Motion to Compel Disclosure of *Brady* and Jencks Act materials. ECF 171. The motion's focus is on the Government's Jencks Act disclosures relating to communications of Agent Hemberg, who testified at trial. Ajayi argued that the Jencks Act entitled Defendants to all emails and electronic communications from Agent Hemberg regarding the subject matter of his testimony, and that "[t]he government does not appear to have produced all of these communications." *Id.* at 3-4. Ajayi also argued that the Government's actions suggested "a narrow interpretation" of its *Brady* obligations, and that its failure to make an unequivocal representation regarding its compliance with *Brady* was cause for further compelled disclosure. *Id.* at 6.

In response, the Government represented that it "produced voluminous discovery in this case, exceeding the requirements of *Brady*, *Giglio*, and Federal Rule of Criminal Procedure 16."

ECF 187 at 1. It also produced to the defense "seven additional items that are potentially Jencks materials." *Id.* These included emails between Agent Hemberg and Assistant United States Attorneys coordinating phone calls with potential Government witnesses, discussing the Superseding Indictment, and attaching/referencing pieces of evidence. ECF 187-1. The Government argued that the Jencks Act does not require the Government to turn over "every single communication between the testifying agent . . . and the attorneys for the government." *Id.* at 3. Defendant Ajayi filed a reply in support of her motion to compel on July 11, 2025, reiterating her argument that the Government failed to produce complete *Jencks* material and questioning the Government's compliance with *Brady* and *Giglio. See generally* ECF 191.

On July 11, 2024, Defendants filed a motion for new trial raising a litany of objections that they contend justify the imposition of a new trial. ECF 190. Defendants' objections largely boil down to evidence they claim was "wrongly kept out" as well as evidence "wrongly let in." ECF 190 at 4. On July 25, 2025, the Government responded to Defendants' motion, arguing that the Defendants had not identified "a single error or set of errors that would merit granting a new trial in this case[.]" ECF 196 at 4. On August 1, 2025, Defendants filed a reply in support of their motion for new trial. ECF 197 at 1. In addition to arguments in support of their opening brief, the Defendant's reply included a section entitled "Additional Evidence," detailing an alleged inconsistency between documentary evidence submitted in the case and public source information that Defendants argue warrants a new trial. *Id.* at 1-2. Defendants explained they would not oppose any request by the Government to file a sur-reply to address this "Additional Evidence." *Id.* at 2. On August 25, 2025, the Government filed a motion for leave to file a sur-reply in support of its opposition, responding to the Defendants' new "Additional Evidence." ECF 201.[3] The

---

[3] A court "has the discretion to allow a sur-reply where a party brings forth new material or deploys new arguments in a reply brief." *Sowers v. United States*, No. 1:17CV1490 (TSE/IDD), 2018 WL 6709509, at *13 (E.D. Va. Dec. 20,

Government explained that former employees conducted Defendant Ogunwale's performance review, and that the mention of other employees was a technical glitch. *See generally* ECF 201-1. The Defendants filed a supplemental memorandum in support of its motion for new trial on August 26, 2025. ECF 203.

## II.    LEGAL STANDARD

### A.    Federal Rule of Criminal Procedure 33

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." The decision whether to grant a new trial is committed to the discretion of the trial court, which "should be exercised sparingly." *United States v. Arrington*, 757 F.2d 1484, 1486 (4th Cir. 1985). While Rule 33 does not define "the interest of justice," the grounds include "a verdict against the weight of the evidence, newly discovered evidence, and misconduct involving the jury, the judge, or the lawyers," as well as any other "error sufficient to require a reversal on appeal." 3 Wright & Miller's Federal Practice & Procedure § 589 (5th ed.). When determining whether to grant a motion for a new trial based on the weight of the evidence, the trial court must assess whether "the evidence weighs so heavily against the verdict that it would be unjust to enter judgment." *Arrington*, 757 F.2d at 1485.

### B.    Jencks Act

Under the Jencks Act, "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (hereinafter defined) of the witness in the possession of the United States which relates

---

2018) (citation omitted). Given the Defendants' admission that this information was not raised in their initial brief, and their waiving of any opposition to a sur-reply to address the issue, this Court finds the filing of the Government's sur-reply is appropriate. *See* ECF 197.

to the subject matter to which the witness has testified." 18 U.S.C. § 3500(b). As relevant here, "statement" means "a written statement made by said witness and signed or otherwise adopted or approved by him." *Id.* § 3500(3)(1). This definition is "precise and circumscribed," and applies to writings with an "element of finality and completeness" as opposed to "rough notes" or "jottings" that "serve only a limited and temporary purpose" in the course of an investigation. *United States v. Hinton*, 719 F.2d 711, 717-718 (4th Cir. 1983). Courts are not typically involved in the production of Jencks material but should "make an *in camera* inspection" of potential Jencks material if a defendant "specif[ies] with reasonable particularity that material which may be a Jencks Act statement exists." *United States v. Boyd*, 53 F.3d 631, 634 (4th Cir. 1995).

## C.    Brady

*Brady v. Maryland*, 373 U.S. 83 (1963) entitles criminal defendants "to the disclosure of evidence that is 'both favorable to the accused and material to guilt or punishment.'" *United States v. Abdallah*, 911 F.3d 201, 217 (4th Cir. 2018) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987)).[4] The "typical *Brady* case" arises when "a defendant has discovered exculpatory evidence after trial." *Id.* But a defendant may also demand an *in camera* review by the Court of confidential material in the Government's possession to determine if it should be disclosed under *Brady*. *Id.* at 217-218. To warrant an *in camera* inspection, a defendant must "make some plausible showing that exculpatory material exists" by "identify[ing] the requested confidential material with some degree of specificity." *Id.* (cleaned up) (citations omitted). This standard, while "meager," ensures "that the defendant does not conscript the court for 'a groundless fishing expedition.'" *Id.* (quoting *United States v. King*, 628 F.3d 693, 703 (4th Cir. 2011)); *see also Ritchie*, 480 U.S. at 59 ("A

---

[4] Courts apply "the same legal principles" material under *Giglio v. United States*, 405 U.S. 150, (1985), as to *Brady* material, because "*Giglio* material is merely a sub-set of the universe which comprises *Brady* material." *United States v. Beckford*, 962 F. Supp. 780, 786 (E.D. Va. 1997). The Court's rulings and analysis under *Brady* therefore also encompasses *Giglio*.

defendant's right to discovery exculpatory evidence does not include the unsupervised authority to search through the [government's] files.").

## III.    ANALYSIS

### A.    Rule 33

Defendants' Rule 33 motion adopts an unusual approach. Although Defendants cite authority that relates to the weight of the evidence, Defendants do not argue that the jury's verdict was against the weight of the evidence. *See generally* ECF 190. Instead, Defendants set forth a veritable cornucopia of objections—at least seven—to the proceedings, and insist those errors prejudiced the outcome of the trial. *Id.* The Court will address these issues in turn to determine whether the verdict was tainted by an "error [or errors] sufficient to require a reversal on appeal." 3 Wright & Miller's Federal Practice & Procedure § 589 (5th ed.).

#### 1.    Rule 17 Subpoenas

Defendants' first argument rehashes an issue that was litigated extensively prior to the trial. Ogunwale filed no fewer than four motions for Rule 17 subpoenas *duces tecum*, one of which the Court granted because it identified specific, potentially relevant documents. Now, despite hardly using the proposals that Project HOPE *did* produce, Defendants insist the Court's failure to compel more fulsome compliance with that subpoena (or grant his other requests for subpoenas) mandates a do-over.

Rule 17 subpoenas *duces tecum* play a highly circumscribed role. They "cannot substitute for the limited discovery otherwise permitted in criminal cases and the hope of obtaining favorable evidence does not justify the issuance of such a subpoena." *United States v. Caro*, 597 F.3d 608, 620 (4th Cir. 2010). Courts apply the standard set out in *United States v. Nixon*, 418 U.S. 683 (1974) when considering a motion for a subpoena *duces tecum* under Rule 17. *See United States v. Richardson*, 607 F.3d 357, 363 (4th Cir. 2010); *see also United States v. Bank*, 2019 WL

1510324, at *3 (E.D. Va. Apr. 5, 2019). Defendants "bear[] the burden under *Nixon* of showing that the material he has subpoenaed meets the requirements of '(1) relevancy; (2) admissibility; [and] (3) specificity.'" *Richardson*, 607 F.3d at 368 (quoting *Nixon*, 418 U.S. at 700) (alteration in original). The subpoena must also be sought "in good faith and [must] not [be] intended as a general 'fishing expedition.'" *Id.* (quoting *Nixon*, 418 U.S. at 700) (alterations in original). In particular, the "specificity and relevance elements require more than the title of a document and conjecture as to its contents." *United States v. Arditti*, 955 F.2d 331, 345 (5th Cir. 1992); *see also United States v. Morris*, 287 F.3d 985, 991 (10th Cir. 2002) (upholding denial of subpoena where defendant was "[n]ot only . . . unable to specify what the items he requests contain," but also "unable to verify whether the requested material exists").

Defendants argue first that the documents requested were "essential to proving . . . innocence." ECF 190 at 1. Whether or not that is true, denying the motions was proper because they were so broad as to fail even the slightest scrutiny under *Nixon*. The initial motion, for example, sought 57 broad categories of documents including, *inter alia*, invoices, internal policies, budget proposals, meeting minutes, and timekeeping records. ECF 30. This lack of specificity was fatal to the motion. *See* Feb. Motions Tr. at 51:7-53-5. (noting that "it's not the Court's job to try to sift through a much larger amount [of requested documents] just to figure out whether there's a nugget of something that is appropriate and is relevant").

The second motion for a subpoena *duces tecum* was narrower, but came only marginally closer to identifying specific, relevant documents. It sought eight categories of information including Ogunwale's entire employment file, all contracts awarded to Project HOPE based on Ogunwale's work, and copies of any funding proposals Ogunwale worked on, as well as the contents of Ogunwale's filing cabinet in his Project HOPE office. ECF 67; ECF 70. Despite the

20

motion's facial overbreadth on all counts, the Court recognized that a narrower set of funding proposals that related to Ajayi's or Adeoye's invoices *might* be relevant, as they could potentially show that the work billed for was performed by Ajayi or Adeoye. Mar. Motions Tr. at 21:15-29:10. After the Government sent a list of invoices to Defendants, the Court granted Ogunwale's third motion for issuance of a subpoena *duces tecum* for "a complete copy of the final versions" of thirty related proposals. ECF 85.

Ogunwale's fourth motion for a subpoena requested, in relevant part, "[f]ive examples of pre-positioning consultants' invoices that are not alleged to be fraudulent." ECF 126.[5] That motion was properly denied because, as the Court found, non-fraudulent invoices from other contractors were not relevant evidence. May Mot. Tr. at 17:20-23. This proved correct. The Government's theory at trial was that the invoices were fraudulent because Ogunwale himself drafted them and Ajayi did not perform the work, not because the invoices were not like other contractors' non-fraudulent invoices. Furthermore, the request for any five invoices was deficient because it involved nothing more than "conjecture as to [the] contents" of the invoices Project HOPE would provide. *Arditti*, 955 F.2d at 345. There was thus no error in the Court's denial of Ogunwale's first, second, or fourth motions for a subpoena *duces tecum*.

Defendants' second subpoena-related argument is regarding Project HOPE's compliance with the subpoena the Court issued. Project HOPE, in correspondence with Ogunwale's counsel, explained in detail why it did not turn over some of the "final proposals" listed in the subpoena, noting that Project HOPE was not a primary applicant or the opportunity "did not advance to the stage of submitting a final proposal." ECF 114-3. Defendants argue now that these representations were false and that Laura Brye's trial testimony contradicted them. First, they argue that Laura

---

[5] The other element of the motion was disposed of by stipulation prior to trial. May 8 Motion Tr. (ECF 175) at 14:24.

Brye "testified that proposals would have been stored in a neatly organized shared drive" and that she "had located" "certain past proposals" but had not *herself* "shared them with the government." ECF 190 at 7. The Court finds that Brye's testimony was not in fact inconsistent with Project HOPE's representation. Brye said that in general, business development would keep proposals on a shared drive but did not say they were "neatly organized." *See* Tr. Vol. 2A at 154:20. As for proposals for which Project HOPE was a subrecipient, she said that "[m]ost of the time" they would keep those proposals "if [they] were allowed," not that all the proposals in the subpoena were in fact held in Project HOPE's records. *Id.* at 155:11, 162:1-2. Defendants also claim that Brye's testimony demonstrated that "Project HOPE had [only] chosen to look for a subset" of the thirty proposals requested. ECF 190 at 7. It did not. Brye testified that there were roughly twenty proposals on the list she was asked to look for. Tr. Vol. 2A at 160:25-161:1. Her subsequent response, "[y]eah," to the question of whether it "could have been 15" is not evidence that Project HOPE deliberately failed to comply with the subpoena. *Id.* at 161:2-3.[6]

Finally, Defendants argue for the first time in their reply that "Additional Evidence" shows a potential inconsistency regarding which individuals conducted Ogunwale's performance reviews and argue in their supplemental memorandum that this undermines "virtually all of the evidence presented at trial." ECF 197 at 1-2; ECF 203-1 at 2. Defendants' last ditch effort to create concern regarding Project Hope's document production falls flat. Defendants failed to raise any concerns about the legitimacy of these documents at any point either before or during trial, choosing instead

---

[6] Defendants' other argument is inapposite. They claim that "Neri testified that he would have been able to locate pre-positioning materials, but had not tried to." ECF 190 (citing Tr. Vol. 2B at 69:7-25, 98:2-7). But as the Government points out, the subpoena that issued to Project HOPE *did not request* pre-positioning materials and only required the production of final proposals. ECF 196 at 7 (citing ECF 85). Accordingly, Defendants have shown no error in the Court's failure to either grant the first, second, and fourth subpoena requests or in its refusal to involve itself in Project HOPE's responses, much less that any such error was prejudicial. Indeed, Defendants' insistence that the proposals themselves were essential to their defense is belied by the fact that the fifteen final proposals they *did* receive were hardly addressed in the trial and were never introduced to show that Ajayi's invoices were not fraudulent.

to wait until their reply brief to raise any concerns. Further, the Defendants overstate the significance of the documents. The documents at issue were not discussed in any detail during trial by either the Defendants or the Government and the documents themselves were not admitted as evidence at trial. ECF 201-1 at 2. Also, as with Defendants' other arguments, these documents fail to negate the overwhelming testimony that Ajayi submitted dozens of false invoices to Project HOPE with Ogunwale's help.

### 2.  The Government's Requests for Stipulations

Defendants claim that the trial was infected by the Government's requests that they enter into two stipulations that were not only false but *known* to the Government to be false.

First is the stipulation that Project HOPE "did not necessarily receive copies of the final technical or cost proposal when it was a proposed subrecipient" or where it "did not advance to the stage of submitting a final proposal." Tr. Vol. 3 at 253:15-25. Defendants claim that Brye's testimony showed that this stipulation was false, and that "the government may well have learned of these proposals." ECF 190 at 8. The argument here suffers from a clear defect: Brye's testimony does not contradict the stipulation. As described above, she testified to her understanding that "most of the time" Project HOPE would keep proposals for which it was a sub-recipient and would do so "if we were allowed to." Tr. Vol. 3 at 155:11, 162:1-2. This is not inconsistent with the stipulation that Project HOPE "did not necessarily" receive those copies.

Defendants next argue that the Government sought a stipulation as to venue on the wire fraud counts before dismissing those counts because it could not prove venue. ECF 190 at 8-9. First of all, the Government has proffered a reasonable explanation for its conduct and eventual decision to drop the wire fraud counts. ECF 196 at 12-13; *see also* ECF 196-4; ECF 196-5; ECF 196-6. But even assuming the Government acted in bad faith, this Court is at a loss as to how the

23

proposed stipulation could have prejudiced Defendants at trial when (1) they never agreed to it, and (2) it involved counts that were dismissed before trial and never submitted to the jury.

### 3. Motions to Travel

Defendants next argue that the Court's denial of Ogunwale's motions to travel overseas to collect "records from financial institutions" in Nigeria was improper. Denial was proper for two reasons.

To begin with, while Defendants argue that the Court "refused to accept that this evidence could not be sought from overseas," ECF 190 at 10 (citing Mar. Motions Tr. 33:5-17), there was no evidence in the record that Nigerian bank records could only be obtained by Ogunwale himself. He did not submit any declaration, affidavit, or other attachment that could provide any factual basis for his claim. *See* ECF 61; ECF 68. There was no evidence for the Court to "refuse[] to accept" when it denied his motion to travel.[7]

Second, Defendants do not argue that the Court misapplied the relevant standard for considering a modification to Ogunwale's conditions of pretrial release. The operative question is not only whether he demonstrated a need to collect evidence. The Bail Reform Act requires the Court to impose conditions of release that "will reasonably assure the appearance of the person as required." 18 U.S.C. § 3142(c)(1)(B). The Court reasonably determined in finding that travel to Nigeria—a country to which he has deep ties—just weeks before a federal criminal trial would pose an undue risk of Ogunwale's non-appearance. Mar. Motions Tr. at 33:5-17.

---

[7] Ogunwale later filed a declaration from Dayo Fasola stating that records of certain transactions could only be requested in person. *See* ECF 128-1 ¶ 8. Of course, that declaration was inaccurate in other respects, as it stated that it would likely take Fasola sixty business days to arrange for travel to the United States, though she did so in a fraction of that time. *Id.* ¶ 10.

### 4. Limits on Fasola's Testimony

Defendants next argue that their witness, Dayo Fasola, should have been granted more leeway in her testimony in two different ways. First, they suggest Fasola should have been allowed to testify as to common Nigerian financial practices. Next, they argue that the Court improperly prevented her from describing Ogunwale's motive for transmitting money through her.

Defendants first argument suggests that the Court barred all possibility of testimony regarding Nigerian financial practices by closing the door to such testimony from Fasola as either a lay witness or an expert. ECF 190 at 12. But the Court did not impose such a Catch-22. Defendants could have presented this testimony through a properly qualified expert. *See, e.g. United States v. Banki*, 2010 WL 1875690, at *4 (S.D.N.Y. 2010) (qualifying defense expert in hawala money transfer system who would "explain how a hawala functions, describe some classic characteristics of a hawala, and then compare the conduct in this case to his definition"). And the Court did not ultimately prevent Defendants from attempting to qualify Fasola as such an expert. May 8 Motions Tr. at 8:20-9:11 (explaining that "none of my ruling prevents you from, if it's appropriate, having her, outside the presence of the jury, to have her questioned, have the government cross-examine" to determine whether she could testify as an expert). Moreover, a decision to bar Fasola from testifying as an expert would have been within the Court's discretion. Ogunwale's expert notice was filed a week after the Court's deadline, and just two weeks before the trial, which is sufficient cause for denying it. *United States v. Dorsey*, 45 F.3d 809, 816 (4th Cir. 1995); *see* ECF 109; ECF 13 at 4-5. The expert notice also failed to meet the burden of demonstrating that Fasola's testimony was relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Fasola's materials did not explain how her understanding of Nigerian commerce generally was premised on reliable principles or methods. *See* ECF 129-1 (resume showing Fasola's experience was primarily in media and ministerial work). And whether

or not informal money transmitting is common in Nigeria would have provided little or no additional relevant information to the jury beyond Fasola's lay testimony that she did in fact transmit money from Ogunwale to Ajayi.

Next, Defendants object to the Court's decision to exclude Fasola's understanding of the reasons for Ogunwale's transfers as hearsay. But her understanding of Ogunwale's inquiries would only be relevant if offered for the truth of those inquiries—i.e., that they were unsuspicious transactions between Ogunwale and Ajayi that explained the dollar transfers from Ajayi to Ogunwale. They were thus properly excluded under Federal Rule of Evidence 801(c).

### 5. Agent Hemberg's Testimony Regarding His Interactions with Ajayi

Ajayi next argues that she was prejudiced by the Government's use of perjured testimony from Agent Hemberg as part of the following exchange regarding his attempt to interview her at her residence:

> HEMBERG: [Ajayi] answered. We identified ourselves, you know, which agency we were with. Indicated we needed to – would like to speak with her about her previous work as a consultant with Project HOPE, and her initial response was, Oh, God.
>
> Q: And what happened next?
>
> A: She indicated that she had to go to work and; like, fine; we can reconnect later, and you know, that was it.

Tr. Vol. 3 at 166:23-167:6. Ajayi's argument is that Hemberg's statement "that was it" constituted perjury because Ajayi agreed to an interview later that afternoon. ECF 190. This, she claims, left a highly prejudicial misimpression of an "attempt to evade law enforcement." ECF 190 at 17.

If this were an attempt by the Government to suborn perjury, they made awfully poor work of it. Later in their examination of Agent Hemberg, the Government asked about "when [he] met with [Ajayi] later that afternoon." Tr. Vol 4A at 11:18-19; *see also id.* at 11:3-7 (Hemberg testifying that "[w]e agreed to meet later that afternoon back at her apartment and we subsequently

met later that day").  And even setting aside that later testimony, Hemberg's "that was it" is best read as applying to that discrete interaction, not the entire scope of his interactions with Ajayi.[8]

To be sure, "[c]ourts must conduct a searching inquiry of the nature and circumstances of the error when it comes to light after a criminal trial that the testimony of a Government witness was less than completely accurate." *United States v. Russell*, 2025 WL 1287699, at *4 (D. Md. May 2, 2025). But the circumstances here, in which an ambiguous statement was subsequently clarified, do not demand such an inquiry.[9]

### 6. Defendants' Motions to Sever and Ajayi's Failure to Request a Limiting Instruction

Finally, Ajayi claims that the jury was prejudiced by the introduction of evidence regarding Ogunwale's dealings with Adeoye, to whom he also sent invoices that he would approve shortly thereafter for work Project HOPE employees said was never performed. She appears to both (1) renew her challenge to the Court's denial of Defendants' motion to sever their trials, and (2) claim that the Court erred by not *sua sponte* issuing a limiting instruction as to the evidence involving Adeoye.

To the extent Ajayi challenges this Court's decision not to sever her trial from Ogunwale's, there was no error. *See* 190 at 18 (noting the Court's denial of motion to sever in February, and denial or renewed motion in the middle of trial). Federal Rule of Criminal Procedure 8 "contemplates the joinder of offenses and defendants in cases where," as here, "the defendants are charged in a single common scheme or plan." *United States v. Smith*, 44 F.3d

---

[8] Indeed, this is likely how Ajayi's trial counsel, understood it. While he cross-examined Hemberg as to the other details of his interaction with Ajayi, he did not seek to correct what she now claims was a highly prejudicial misimpression. *See* Tr. Vol. 3 at 230-231.

[9] While Ajayi's argument sounds in the terms of *Napue v. Illinois*, 360 U.S. 264 (1959), she comes nowhere near making out a plausible *Napue* claim, for the reasons explained above. *See Juniper v. Davis*, 74 F.4th 196, 211 (4th Cir. 2023) (defendant must show (1) falsity; (2) materiality; and (3) the prosecution's knowledge of falsity); *see also Blumberg v. Garcia*, 687 F. Supp. 2d 1074, 1131 (C.D. Cal. 2010) ("ambiguities . . . insufficient to meet *Napue*'s standard for falsity").

1259, 1266 (4th Cir. 1995). Severance under Rule 14 is appropriate when there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)). This was not such a case. While there was testimony as to Ogunwale's relationship with Adeoye, the great bulk of the evidence involved his conspiracy with Ajayi. The evidence regarding Ajayi and Ogunwale was also "sufficiently distinguishable to allow the jury to assess independently the guilt of each" defendant. *Smith*, 44 F.3d at 1267. And the Court instructed the jury to "give separate and individual consideration to each charge against each defendant" by "analyz[ing] what the evidence in the case shows with respect to that defendant and that count." Tr. Vol. 4A at 79:1-7; *see Smith*, 44 F.3d at 1267 ("The jury had ample opportunity to assess the evidence and was fully and properly instructed by the court on how to assess the evidence independently with respect to each defendant."). Denial of the motions to sever was thus well within this Court's discretion.[10]

Ajayi next suggests that the lack of a limiting instruction as to the evidence involving Adeoye is grounds for a new trial. To be sure, it is often appropriate in joint trials for the Court to issue limiting instructions that explain to the jury that specific evidence may only be considered against one codefendant. *Zafiro*, 506 U.S. at 539. The Court here recognized as much, discussing with counsel the issue of "a limiting instruction, that the evidence regarding Mr. Adeoye not be[] used against Ms. Ajayi." Tr. Vol. 4A at 24:6-9. The Court addressed counsel for Ms. Ajayi clearly

---

[10] Ajayi also raises a roundabout and, to be frank, confounding argument that because the Court instructed jurors that they could consider acts and statements of co-conspirators in assessing guilt of conspiracy, the jury would "conclude that these final instructions authorized use of Mr. Adeoye's actions against Ms. Ajayi." ECF 190 at 20. This ignores the instruction that to become a part of a conspiracy, there must be "conscious understanding and deliberate agreement by the alleged members." Tr. Vol. 4A at 101:23-24. There was no evidence introduced at trial that Adeoye and Ajayi ever knew of each other, much less entered into an agreement.

28

on this point, stating that "the burden is on you as defense counsel, so make sure that the instructions reflect that issue if you believe it needs to be articulated." *Id.* at 25:1-6.

The Court did not issue such an instruction because Ajayi's counsel did not request one. *See United States v. Hayden*, 85 F.3d 153, 160 (4th Cir. 1996) (affirming conviction where "the court gave no limiting instructions" but "none were requested"). Because "[t]he evidence against [Ajayi] was fairly strong," with witnesses testifying as to Ajayi's specific actions and inactions, and "the case was not so complex that the jury could not separate the evidence as to each defendant" under the instructions as given, the "jury could have made an individual determination as to [Ajayi's] guilt" and was not prejudiced by the lack of an instruction. *Id.* at 160-161.[11]

### 7. Introduction of Bank Records

Finally, Ajayi argues that this Court incorrectly denied her motion to suppress her bank records, which were obtained by the Government without a warrant. ECF 190 at 21-24. She argues that because those bank records incidentally revealed her location at various times (i.e., by showing that a purchase was made at a particular store or a withdrawal was made at a specific ATM), they must be excluded under the Supreme Court's holding in *Carpenter v. United States*, 585 U.S. 296 (2018), and the en banc Fourth Circuit's decision in *United States v. Chatrie*, 136 F.4th 100 (4th Cir. 2025) (en banc).

The great challenge for Ajayi here is the Supreme Court's decision in *United States v. Miller*, 425 U.S. 435 (1976). There, the United States subpoenaed "several months of canceled checks, deposit slips, and monthly statements" from Miller's bank. *Carpenter*, 585 U.S. at 308.

---

[11] The Government also suggests that the invited error doctrine applies. ECF 196 at 21. While unnecessary to resolve Ajayi's objection, the Court finds that the doctrine likely applies in a case where the ball was plainly and affirmatively in defense counsel's court to suggest an appropriate instruction. *See Shields v. United States*, 273 U.S. 583, 586 (1927) ("A defendant in a criminal case cannot complain of error which he himself has invited."). Ajayi's trial counsel was well aware that he could request such an instruction, but for whatever reason—strategic or otherwise—chose not to.

Miller claimed he had a reasonable expectation of privacy in those records, which revealed numerous personal details about his life and financial affairs. *Miller*, 425 U.S. at 442. The Court rejected this challenge, as "the documents obtained, including financial statements and deposit slips, contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business," and Miller thus lacked any "legitimate expectation of privacy" in the information therein. *Id.*

In *Carpenter*, on the other hand, the Supreme Court considered orders under the Stored Communications Act directing the defendant's wireless phone carriers to turn over cell site location information ("CSLI") over several days. "Altogether the Government obtained 12,898 location points cataloguing Carpenter's movements—an average of 101 data points per day." 585 U.S. at 302. The Court distinguished *Miller* based on "the unique nature of cell phone location records," finding that "the fact that the information is held by a third party does not by itself overcome the user's claim to Fourth Amendment protection." *Id.* at 310. In doing so, the Court displayed "a special solicitude for location information in the third party context," and noted that CSLI creates "a detailed chronicle of a person's physical presence compiled every day, every moment, over several years." *Id.* at 315. The Court further distinguished cases like *Miller* by finding that CSLI "is not truly 'shared' as one normally understands the term," as it is recorded "without any affirmative act on the part of the user." *Id.* Importantly, the Court's *Carpenter* decision was a "a narrow one" that did not govern "other business records that might incidentally reveal location information." *Id.* at 316.

*Chatrie*, in turn, involved a "geofence warrant," with which the Government compelled Google to disclose information for users whose devices were logged at or near a particular location related to a crime under investigation. 136 F.4th at 102 (Diaz, J., concurring). In a confounding set

of eight concurring opinions (and a single dissent), the en banc court upheld the district court's denial of a motion to suppress under the good-faith exception. The case thus stands for little more than that, at the time the warrant issued, it was "not *so* lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 104 (quoting *United States v. Chatrie*, 590 F. Supp. 3d. 901, 907 (E.D. Va. 2022)).

Ajayi is correct that "many judges . . . have emphasized one's privacy interest in location history," ECF 190 at 22. But even the judges with whom she allies herself recognized that the difference between *Miller* and *Carpenter* was that "the conveyance of CSLI" was "not meaningfully voluntary." *Chatrie*, 136 F.4th at 120 (Wynn, J., Concurring). While CSLI is generated automatically whenever a person turns on her cell phone, Ajayi's bank records were generated whenever she chose to use her bank cards to initiate a purchase, overtly requesting that the bank engage in the transfer of funds to a vendor or other person. Furthermore, the location information that can be gleaned from the bank records pales in comparison to CSLI. It is not, as Ajayi claims, a "precise[] record" of her every movement, but a scattershot chart of locations where Ajayi may or may not have personally been. Accordingly, this Court will join others that have held that *Carpenter* did not disturb *Miller's* holding even when the business records sought reveal location information. *See, e.g. United States v. Frei*, 2019 WL 189286, at **2-3 (M.D. Tenn. Jan 14, 2019); *Harper v. Rettig*, 675 F. Supp. 3d 190, 200-203 (D.N.H. 2023); *United States v. Powell*, 2024 WL 3187343, at *2 (N.D. Cal. June 25, 2025). As for Ajayi's insistence that *Miller* "has been overruled by *Carpenter* and the ensuing caselaw," this Court will wait for guidance from the Fourth Circuit or Supreme Court before determining that a half-century-old precedent has been overruled. *Cf. Madison v. Virginia*, 474 F.3d 118, 127 (4th Cir. 2006) ("[W]e may not overlook decades of clear directives in response to [a] claim that the Supreme Court has overruled *sub silentio* its prior

precedents.").[12] There was thus no error in allowing the Government to introduce the bank records against Ajayi.

## 8. Prejudice

Finally, Defendants argue that because there was considerable evidence of innocence, their claimed errors were prejudicial. ECF 190 at 24-27. This is not an argument that the weight of the evidence demands a new trial. Rather, Defendants appear to be challenging any argument that the errors they describe were harmless and would not warrant reversal. *See* 3 Wright & Miller's Federal Practice & Procedure § 589 (5th ed.) (new trial is warranted when a trial was plagued by an "error [or errors] sufficient to require a reversal on appeal). Under the harmless error rule, "a court of appeals normally engages in a specific analysis of the district court record — a so-called 'harmless error' inquiry — to determine whether the error was prejudicial." *United States v. Brown*, 136 F.4th 87, 93 (4th Cir. 2025) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)).

The Court has not found any error among Defendants' litany of arguments. But even if there were an error or errors, it would not have prejudiced either Defendant as to the jury's ultimate determination of guilt. The jury heard extensive evidence of a brazen scheme between Ogunwale and Ajayi to abuse Ogunwale's position of authority at Project HOPE and defraud it of funds by billing for consulting work or other services that were never provided. Time and again, Ogunwale would send Ajayi an email from his personal email address, attaching an already-completed invoice form and instructing Ajayi to promptly return that form to Project HOPE and copy his

---

[12] Even if the warrantless subpoena for Ajayi's bank records did violate the Fourth Amendment, the lack of any law supporting Ajayi's position at the time of the subpoena would warrant the application of the good faith exception to the exclusionary rule. *Davis v. United States*, 564 U.S. 229, 238 (2011) ("[W]hen the police act with an objectively reasonable good faith belief that their conduct is lawful . . . the deterrence rationale [of suppression] loses much of its force, and exclusion cannot pay its way.") (cleaned up).

work email address. Tr. Vol. 3 at 129-157. Ajayi would do so, after which Ogunwale would approve the invoices, which Project HOPE would then pay. *Id.* To make it appear that the invoices reflected real work, they referenced proposals or other tasks that Project HOPE was actively working on. But Ajayi did not do the work that Ogunwale described in the invoices he drafted. Three witnesses who worked actively with Project HOPE's business development team testified that they never met, contacted, or even knew of Ajayi, and that they or others known to them in fact did the work that Ajayi billed for. Tr. Vol. 2B at 29-49, 134-143; Tr. Vol. 3 at 29-38. This evidence of the conspiracy was strong, uncontroverted, and hardly difficult for the jury to comprehend. They could easily have convicted without even considering the extensive evidence regarding Compass Management, AbbiFabDynamics, Adeoye, or the fact of other financial transactions between Ogunwale and Ajayi.

Defendants' arguments to the contrary are unpersuasive. They first point to evidence that "it was common to have consultants based abroad" and that during some of the relevant time "Ajayi lived in Nigeria." ECF 190 at 25. But many (indeed most) people live outside the United States. That Ajayi may have lived outside of the United States during the relevant period is not strong evidence that she in fact completed the consulting work described in the invoices Ogunwale sent her. Next, Defendants point to the fact that Project HOPE "may not have complied with its policies regarding PayPal" and "never sought a chargeback" from PayPal. *Id.* (citing Tr. Vol. 1 at 249:19-21; 50:12-17; Tr. Vol. 2A at 38:16-23, 46:10-24). For one, this evidence only applies to the PayPal vendor invoices, not the ones Ajayi submitted directly. And it is unclear to the Court how Project HOPE's failure to take certain action with respect to PayPal—years down the line when Ogunwale's conduct was discovered—shows that the PayPal invoices were accurate.

Defendants' next argument harkens back to their primary theme throughout the case: that prepositioning work, as opposed to applications for discrete funding opportunities, was complicated and not always clearly memorialized. ECF 190 at 25. They also identify evidence that Ogunwale would work directly with consultants without others' full knowledge. *Id.* at 26. That may be true, but Defendants ignore that much of what Ajayi billed for was not related to prepositioning work and involved teams with people other than Ogunwale. There was no evidence in checklists or other internal documents that Ajayi worked on the proposals she claimed to have, and Project HOPE witnesses testified that she did not do that work. Even if she did discretely help Ogunwale with prepositioning work, that is irrelevant to the alleged fraud.

Finally, Defendants argue that Fasola's testimony regarding her money transfers for Ogunwale was exculpatory because it provided an innocent explanation for the domestic transfers form Ajayi to Ogunwale. ECF 190 at 27. Again, even if the Court gives full credit to her testimony, it is largely beside the point. The jury could easily have fully credited Fasola's testimony yet still convicted Defendants, as Ajayi still would have submitted dozens of false invoices to Project HOPE with Ogunwale's help.

In sum, the exculpatory evidence Defendants identify is either indirect or irrelevant when placed beside the substantial direct inculpatory evidence that the Government presented. Even if the Court did err on any of the grounds discussed above, close consideration of the evidence presented at trial shows any error would have been harmless.

### B.    Motion to Compel

In her other set of post-trial pleadings, Ajayi seeks an order from the Court telling the Government "to identify whether undisclosed communications of the testifying agent exist, and to disclose them if it has not," and also to "identify the steps it has taken to identify *Brady/Giglio* material of which it is aware, and to disclose any such material it has not." ECF 171 at 7. She does

not identify any authority by which such an order may issue, but the Court will construe her request as a demand for this Court's intervention to ensure the production or relevant Jencks or *Brady* material. As the Fourth Circuit has held, "an *in camera* review is only required under the Jencks Act if the defendant provides a proper foundation for the request, and is only required under *Brady* if the defendant makes a plausible showing that the files contain evidence that is material and favorable to the defense." *United States v. Savage*, 885 F.3d 212, 221 (4th Cir. 2018). But Ajayi has not provided a proper foundation for her Jencks request or a plausible showing relevant to her *Brady* request, and therefore the motion will be denied.

### 1. Jencks Act

Ajayi's Jencks Act argument boils down to this: any email, text message, or other electronic communication between Agent Hemberg and the prosecutors working on this case must be turned over. ECF 171 at 4. She claims such communications "are highly likely to exist, and are produced as Jencks in virtually every federal criminal case." *Id.* In response to this motion, the Government turned over several additional email chains to the defense, which include Agent Hemberg's "affirm[ation] that the allegations in the superseding indictment are correct," a "draft summary exhibit," a "handful of short notes," and summary emails attaching records that had previously been turned over in the course of discovery. ECF 187 at 2. The Government argues that these "may not necessarily be Jenck's [sic.] material," and that the demand for "all communications involving Agent Hemberg . . . far exceeds the bounds of the law." *Id.* In reply, Ajayi again insists that all of Agent Hemberg's communications pertinent to the case must be turned over, and that the Government's supplemental disclosure raises doubts about the existence of further Jencks material. ECF 191 at 1-3.

To justify a review by this Court of potential Jencks material, Ajayi must "specify with reasonable particularity that material which may be a Jencks Act statement exists." *Boyd*, 53 F.3d

at 634. To the extent she attempts to do so, it is via her request for *all* electronic communications from Agent Hemberg involving this case.

The Jencks Act and much of the caselaw interpreting it are a poor fit for the materials at issue here. After all, Jencks Act cases involve the question of when "a 'statement' of a witness, *as recorded by the Government Agent* qualifies as a statement within the intendment of the Act." *United States v. Hinton*, 719 F.2d 711, 715 (4th Cir. 1983) (emphasis added). Thus, while many cases involve a government agent, it is not in that agent's capacity as a witness, but in their role as an investigator talking to *another* witness in the case. To determine how the Jencks Act applies to written material generated by agents themselves, the Court will look to the Fourth Circuit's statements of the law as well as persuasive out-of-circuit authority.

We begin with the Fourth Circuit in *Hinton*. There, the panel considered whether the Act applied to notes taken by a government agent during a witness' statement to him—that is, did those notes constitute a "statement" of the civilian witness. 719 F.2d at 717-718 The court there was deciding whether to follow those circuits that had adopted a "precise and circumscribed" understanding of "statement" and thus required that writings possess "element of finality and completeness" before disclosure is required. *Id.* at 718. After thorough consideration, the court adopted that majority rule, holding "investigative notes of a government agent" taken during a witness interview "are not statements [of the witness] within the meaning of Section 3500(e)(1)." *Id.* at 722. Later cases have underscored Section 3500(e)(1)'s narrow scope. *See Boyd*, 53 F.3d at 635; *see also United States v. Beckford*, 962 F. Supp. 780, 796 (E.D. Va., 1997). Thus, under the law of this Circuit, a "statement" "must in some way have been adopted or approved by the witness to qualify as Jencks material." *United States v. Roseboro*, 87 F.3d 642, 645 (4th Cir. 1996).

The Fourth Circuit, however, has no published opinions in a case where the agent himself is a witness. The only on-point statement on the issue is in a terse unpublished opinion finding that "Significant Activity Reports" drafted by an FBI agent witness during his work on a case "did not qualify for disclosure under the Jencks Act." *United States v. Castellon*, 382 Fed. App'x 326 (4th Cir. 2010). Courts elsewhere, however, have more definitively held that informal or draft writings by a testifying case agent are not "statements" within the meaning of Section 3500(e)(1). In one case, a neighboring district court held that agents' "rough notes" taken during the investigative process, while often "initialed or signed, and dated," "lack[ed] the element of finality and completeness required to meet the test of an 'approved' statement of the agent" under the Jencks Act. *United States v. Young*, 2013 WL 12430548, at *2 (D.D.C. Apr. 24, 2013) (quoting *United States v. Melo*, 411 F. Supp. 2d 17, 22 (D. Mass. 2006)). The District of Massachusetts in *Melo*, in turn, explained that such notes, even if they bear a signature or initials, were not "signed" in the Jencks Act's sense because that requires "putting a signature or other mark on the notes so as to attest to their accuracy and to intend to be accountable in a formal matter for their contents." 411 F. Supp. 2d at 20. Along these lines, and perhaps most relevantly here, the District of Connecticut in *United States v. Gonzalez*, 2020 WL 3868788, (D. Conn. July 9, 2020), considered a defendant's request for drafts of an agent's affidavit that she exchanged with prosecutors on the case via email. Such drafts, the court found, were not statements because the agent had not "'approved' or 'adopted' any draft affidavit sent to the prosecutor by email." *Id.* at *3. That is, she had not "vouched for" or expressed "assent to the content of the writing." *Id.* (quoting *United States v. Gotchis*, 803 F.2d 7, 77 (2d Cir. 1986); *United States v. Walden*, 465 F. Supp. 255, 260 (E.D. Pa. 1978)).

This Court is persuaded by these cases, under which the mere fact that an agent generated a writing and attached his name or initials to that writing are insufficient to render it a "statement." Rather, circumstances must demonstrate that he meant to "attest to their accuracy and to intend to be accountable in a formal matter for their contents." *Melo*, 411 F. Supp. 2d at 20. Thus, while an affidavit, testimony, or formal report from a testifying agent must be disclosed, the run-of-the-mill emails that might accompany any investigation are unlikely to constitute "statements" under Section 3500(e)(1). Indeed, applying this standard, the emails the Government *did* disclose in response Ajayi's motion likely fall outside of the Act's ambit. The text of the emails, which involve routine updates to the case and present potential or draft exhibits to the prosecutors, do not contain the "element of finality and completeness" that would require disclosure. *Hinton*, 719 F.2d at 718. They are much more akin to the activity reports, emailed drafts, or investigative notes that have been found not to constitute Jencks material. As such, it cannot be the case, as Ajayi insists, that each and every email, text, or other written communication drafted by Agent Hemberg in the course of his work on this case is subject to disclosure under the Act. She has therefore failed to "specify with reasonable particularity" any potential undisclosed Jencks Act material and cannot require this Court to proceed to an *in camera* inspection of such writings. *Boyd*, 53 F.3d at 634.

## 2. Brady

As a general matter, "the prosecutor's decision" regarding *Brady* disclosure's "is final." *Ritchie*, 480 U.S. at 59. To warrant the Court's intervention and require further disclosure, Ajayi must "identify the requested confidential material with some degree of specificity." *Abdallah*, 911 F.3d at 218 (citation omitted). Thus, when a defendant identifies a specific document and sets forth a plausible case that the document contains favorable information, a district court must engage in an *in camera* review of those documents to determine if they must be disclosed. *Id.* at 217-218 (specific interview notes of investigative officer), *King*, 628 F.3d at 703-704 (specific witness'

statement to a grand jury). At the same time, the defense may not use a *Brady* request to "engage in groundless fishing expeditions," and even identifying specific documents is insufficient if the defendant cannot "clearly specif[y] the information contained in the [documents] that he expects will reveal exculpatory or impeachment evidence." *United States v. Trevino*, 89 F.3d 198, 192 (4th Cir. 1996) (quoting *United States v. Zolin*, 491 U.S. 554, 571 (1989)).

Ajayi has made no effort at all to identify any particular documents in the Government's file, let alone argue that those materials would be favorable to her defense. Instead, she complains with little factual basis that the Government has employed "a narrow interpretation of the [*Brady*] doctrine," and nitpicks as to whether the Government has "ma[d]e an affirmative representation as to" whether it has turned over all *Brady* information. ECF 171. But unlike in a civil case, this Court lacks a general mandate to supervise the exchange of discovery between the parties. *See Kasi v. Angelone*, 300 F.3d 487, 504 (4th Cir. 2002) ("*Brady*, however, created no general constitutional right of discovery in a criminal case."). Unless and until Ajayi seeks disclosure of specific favorable evidence the Court cannot intervene. Her motion will therefore be denied.

## IV.    CONCLUSION

Defendants have not identified any valid reason that a new trial is warranted, not set forth cause for this Court to question the Government's Jencks Act and *Brady* disclosures. Accordingly, it is hereby

**ORDERED** that the Government's Motion for Leave to File a Surreply (ECF 201) is **GRANTED**; and it is further

**ORDERED** that the Defendants' Motion for Leave to File Supplement to their Motion for New Trial (ECF 203) is **GRANTED**; and it is further

**ORDERED** that Defendant Ajayi's Motion to Compel (ECF 171) is **DENIED**; and it is further

**ORDERED** that Defendant Ajayi's Motion for a New Trial, which Defendant Ogunwale joins in relevant part (ECF 190), is **DENIED**.

It is **SO ORDERED.**

_____
/s/
Michael S. Nachmanoff
United States District Judge

August 26, 2025
Alexandria, Virginia